**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DR. BRENDA HOLCOMB and DR. ALICE TZENG,<br><br>    Plaintiffs,<br><br>v.<br><br>CARE ONE, LLC,<br><br>    Defendants. | CASE NO.<br><br><br><br>**COMPLAINT** |

## INTRODUCTION

1.   New Jersey's largest private owner of nursing homes and assisted living facilities, Defendant Care One, LLC ("Care One"), recently mandated that all medical providers who treat patients at its facilities, inclusive of physicians, physicians' assistants and nurse practitioners, must receive Covid-19 vaccination or be banned from its facilities.  Care One then abruptly enforced the ban against medical providers including the Plaintiffs who sought and were denied religious and medically based exemptions without explanation or any attempt at reasonable accommodation.

2.   Plaintiffs are physicians with medical practices centered upon patients at Care One facilities whose religious and medically based objections to receiving the COVID-19 vaccine is costing them their livelihoods.  Plaintiffs were abruptly terminated by Care One merely for seeking religious and medically based exemptions to mandatory vaccination in violation of federal

and state law.  Plaintiffs and likely others similarly situated have been punished by Care One merely for expressing and acting on their religious convictions and legitimate medical concerns regarding the Covid-19 vaccine.

3.    Care One's mandatory vaccination policy violates Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act, and the New Jersey Law Against Discrimination, by failing to provide for, implement or properly and fairly administer a reasonable policy for granting religious and medical exemptions to the mandatory vaccination requirement.

4.    Care One's Mandatory COVID-19 vaccination policy is far more extreme than anything currently authorized under federal law. In failing to provide for and properly administer religious and medically based exemptions or offer a reasonable testing and masking alternative, the Care One Mandate is extreme and unreasonable in both its design and in its application.

5.    The Care One Mandate is significantly more extreme than the several vaccine Biden Administration mandates recently enjoined by federal courts, including the mandates promulgated by the Occupational Safety and Health Administration (the "OSHA Mandate") and the Center for Medicare and Medicaid Services ("CMS").

6.    The OSHA Mandate requires all employees with 100 or more employees to "develop, implement, and enforce a mandatory

vaccination policy." The United States Fifth Circuit Court of Appeals previously enjoined the OSHA Mandate in BST Holdings, et al. v. Occupational Safety and Health Administration, citing "grave" statutory and constitutional infirmities. The Fifth Circuit found the OSHA mandate not only exceeded the agency's statutory authority to set emergency temporary standards ("ETS") pursuant to 29 U.S.C Sec. 655(c)(1), but also potentially transgressed the limits of Congressional authority under the Commerce Clause of the United States Constitution.

7. Not mincing words, the Fifth Circuit called the OSHA Mandate "staggeringly overbroad" and a "one-size-fits-all sledgehammer" defying reality and common sense. The Court observed that the "[OSHA] Mandate's "strained prescriptions" combine to make it the rare government pronouncement that is both over-inclusive and under-inclusive. The OSHA Mandate is over-inclusive, according to the Court, in failing to distinguish between various employers relative to occupational risk. It is under-inclusive, the Court found, in purporting to save employees with 99 or more co-workers from a 'grave danger' in the workplace, while making no attempt to shield employees with 98 or fewer co-workers from the very same threat." The Court rejected out-of-hand the stated justification for the OSHA Mandate as addressed to "a purported 'emergency' that the entire globe has now endured for

3

nearly two years and which OSHA itself spent nearly two months responding to. . ."

8.    The Fifth Circuit in BST Holdings found that the OSHA Mandate "threatens to substantially burden the liberty interest and free religious exercise of reluctant individual recipients put to a choice between their job(s) and "the loss of First Amendment freedoms."   In enjoining the OSHA Mandate, the Court concluded that such a burden, even when imposed for minimal periods of time, unquestionably constitutes irreparable injury.

9.    The Court in BST Holdings further determined that the Plaintiffs challenging the OSHA Mandate were substantially likely to succeed on the merits.   Describing the mandate as "fatally flawed on its own terms", the Court called the notion that it might ultimately survive legal and constitutional scrutiny, a "dubious assumption."    OSHA has suspended the implementation and enforcement of its COVID-19 vaccination mandate in compliance with the Fifth Circuit injunction.

10.  According to the Fifth Circuit in BST Holdings, the OSHA Mandate is designed "not to enhance workplace safety, but instead to ramp up vaccine uptake by any means necessary."   The OSHA Mandate sought to achieve this goal by enlisting employers to serve as government surrogates in policing and enforcing compliance within their own respective work forces.  The OSHA Vaccine Mandate, according to the Fifth Circuit, "deputizes employer participation"

4

in the federal government's program for mandatory vaccination in a manner that 'exposes employees to severe financial risk' for non-compliance, and that threatens to decimate their workforce by forcing unwilling employees to take their shots, take their tests, or hit the road."

11.  Unlike the Plaintiff employers in BST Holdings, however, Care One has fervently embraced its role as an enforcement arm of the government in going well beyond even the constitutionally suspect measures the federal government has prescribed.  Both on its face and as applied to the Plaintiffs and likely others similarly situated, the Care One Vaccine Mandate does not allow for religious exemptions of any kind, taking a "vax or leave" approach to mandatory vaccination.

12.  Care One has refused to design, implement and publicize a formal policy with discernable criteria for considering and granting religious and medically based exemptions.  They have considered and denied exemption requests on a purely ad hoc basis, taking punitive action in the form of immediate termination against providers such as the Plaintiffs while granting exemptions to a selected few for reasons neither stated nor evident. Care One not only denied Plaintiffs' request for religious exemptions without explanation and without any formal or informal review process, it terminated Plaintiffs immediately and barred them from Care One facilities merely for having requested the exemption.

## THE PARTIES

13.   Plaintiff, Dr. Brenda Holcomb, is citizen of the state of New Jersey who resides at 82 Roland Road, New Providence, New Jersey 07974.  Dr. Holcomb is an internist with fellowship training in Geriatric Medicine.   She provides subacute rehabilitation primary care to patients in skilled nursing and rehabilitation facilities in the greater Morristown, New Jersey area.  Over the past several years, Dr. Holcomb has developed a practice centered upon patients in Care One facilities, specifically Care One Madison (located in Madison, New Jersey), Care One Morris (located in Morristown, New Jersey) and Care One Hanover (located in Hanover, New Jersey).

14.   Plaintiff, Dr. Alice Tzeng, is a citizen of the State of New Jersey residing at 44 Hillcrest Road, Warren, New Jersey 07059. Dr. Tzeng is a physiatrist specializing in Physical Medicine and Rehabilitation.   Dr. Tzeng has been practicing in subacute rehabilitation facilities since completing her residency in 2003. Dr. Tzeng's affiliation with Care One dates back to her work as a consultant with Care One Madison as a physiatrist in 2004 when the facility first opened.  Dr. Tzeng was later recruited by Care One Madison and Care One Hanover in 2012 to treat patients at those facilities on a regular and full-time basis.  Following maternity leave, Dr. Tzeng has treated patients at Care One Madison exclusively from 2013 until September 2021.  Her engagement with

6

Care One was terminated for seeking a religious-based exemption to mandatory vaccination for COVID-19.

15. Defendant Care One, LLC is a limited liability company located 173 Bridge Street, Fort Lee, New Jersey 07024 and a corporate resident of the State that owns and operates Continuing Care Retirement Communities and Assisted Living Facilities for the elderly.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over this case pursuant to 28 U.S.C. §1331 as this action arises from federal statutes as well as the United States Constitution.

17. Venue properly resides in the District of New Jersey because the parties are domiciled in the State of New Jersey and the events and actions complained of in this action occurred within the State.

## STATEMENT OF FACTS

18. While Care One's COVID-19 Vaccine Mandate purportedly pre-dates existing federal mandates, the mandate represents an attempt by Care One to operate as a surrogate of the federal government by imposing a mandate more extreme than those prescribed by the federal government or that can be lawfully imposed by a government action. According to the September 29, 2021 Memorandum from Care One's Chief Medical Officer addressed generically to medical providers terminated on that date for remaining

7

unvaccinated, Care One mandated the COVID-19 vaccine on July 14, 2021.

19.  Employees and medical professionals working at Care One facilities, however, were not individually notified of the mandatory vaccination policy.  Dr. Tzeng, for example, learned of the mandatory vaccination policy from Dr. Holcomb shortly before she was terminated on September 30, 2021, one day after requesting a religious-based exemption.  Dr. Holcomb became aware of Care One's mandatory vaccination policy from a notice posted at the Care One Madison facility.  Dr. Holcomb applied to Care One for a religious exemption on September 3, 2021, based on her strong, sincerely held religious objections to the COVID-19 vaccine and because she had immunity from the COVID-19 virus, having previously contracted the virus twice and having tested positive for the antibodies.

20.  Dr. Holcomb contracted COVID-19 while treating patients at Care One facilities in the early stages of the pandemic.  Dr. Holcomb was on duty at Care One Hanover in March of 2020 admitting the COVID-19 positive elderly patients that Governor Murphy directed be transferred there from St. Joseph's Assisted Living Facility.  She was infected with COVID-19 for the first time that weekend becoming ill and experiencing serious symptoms.

21.  Dr. Holcomb contracted the virus a second time while on at Care One a month later.  She became more seriously ill after

8

being denied available therapeutic treatments.  She continues to suffer from lingering physical after-effects of COVID-19.

22.  Upon information and belief, Dr. Holcomb's prior exposure to COVID-19 and her residual medical symptoms heighten the risk to her of an adverse reaction to the COVID-19 vaccine.

**A.   Plaintiffs' Applications for Religious Exemption.**

23.  In her September 3, 2021 exception application, Dr. Holcomb cited her Christian convictions as well as her Catholic faith in conscientiously objecting to mandatory vaccination.  Her conscientious objections were founded, among other things, on the abortion derived cell lines of the COVID-19 vaccines.  Her religious-based objections were further founded on the Christian doctrine of therapeutic proportionality and related Catholic Church teachings.  As expressed by Dr. Holcomb in her exemption request, such teachings include the fundamental moral obligation to examine and follow one's conscience in matters of this nature and that to do so is to be one with Christ.

24.  Dr. Holcomb's religious exemption request was initially approved by Care One on September 29, 2021.  Dr. Holcomb was initially informed of the approval orally by staff member Jessica Lopez.  She was then informed in writing in an email from Administrator Jeanne Leus stating:

> Care One's "Covid-19 task force has approved your request for religious exemption at this time."

The email directed Dr. Holcomb "to present this proof to the facility screener to allow entry into the facility." The email further advised Dr. Holcomb that she was "expected to adhere to facility protocol" including with respect to "infection control" and that the "[f]ailure to adhere to facility policy and procedure [would] lend to disciplinary action and termination of services."

25. Later the same day, Dr. Holcomb received a more contentiously toned second email from Ms. Leus attaching a "Cohort Plan" Dr. Holcomb was expected to follow as a condition of her approved exemption. Ms. Leus's second email informed Dr. Holcomb that although her religious exemption request had been approved, she was required "to get an antigen test based on Care One's policy below." The referenced policy required weekly COVID-19 testing unless the criteria for twice-weekly testing from county positivity rates was met.

26. Ms. Leus' second email referred Dr. Holcomb to the Cohort Plan and its emphasis on the use of Personal Protective Equipment or "PPE." The email then referred to a warning that Dr. Holcomb had purportedly received from Dr. Amina Ahmed, Care One's Chief Medical Officer, on August 30, 2021 for her supposed failure to follow protocol and procedure on PPE use. The email continued:

> "Pls. (sic) be reminded that we will NOT tolerate any further deficient practice. Failure to follow facility P&P will result in progressive disciplinary action up to termination of your services."

10

The email concluded by directing Dr. Holcomb to print, sign and return both the email and the attachment to confirm her comprehension of the policy and Care One's expectations.

**B.   Care One Abruptly Revokes Dr. Holcomb's Exemption and Terminates Her Without Explanation.**

27.   The very next morning, September 30, 2021, Ms. Leus emailed Dr. Holcomb yet a third time to advise her that Care One's approval of her religious-based exemption had been in error and that pursuant to an attachment the email described as a letter from Medical Director, Dr. Ahmed, Care One would not allow facility entry to her or any providers who are not fully vaccinated.  The email read as follows:

> "Good morning.  I tried calling you to provide you an update regarding Covid-19 vaccination exemption request. We would like to clarify our error. Pls. (sic) refer to attachment regarding letter from Dr. Ahmed regarding unvaccinated provider.  (Sic) Care One will not allow entry of providers who are not fully vaccinated.  We apologize for the error.  I tried to call you.  Please give me a call when you get a chance."

28.   The attached letter from Chief Medical Director, Dr. Ahmed, referred to in the email dated October 2, 2021, stated as follows:

> October 2, 2021
> Dear Provider, As you are aware, CareOne mandated the COVID-19 vaccine on July 14, 2020, as evidence of our full commitment to safe-guard our communities against COVID-19.   All providers who interact with our residents, including licensed physicians, nurse practitioners, physician assistants, and other medical providers were required to provide a copy of their vaccination card as proof of their fully vaccinated

status no later than September 30, 2021.  We provided ample time for everyone to become vaccinated. Nevertheless, our records show that you have not provided proof that you are fully vaccinated.  This letter is to inform you that practitioners, like you, who have not provided proof of being fully vaccinated are no longer permitted entry into CareOne facilities to perform patient care duties.  Please provide to your local administrator/executive director of the skilled nursing or assisted living facilities associated with your practice the name(s) and contact information for covering provider(s) as soon as possible.  Thank you in advance for your cooperation and support in our efforts to safeguard our communities.

Amina Ahmed MD CareOne Chief Medical Officer

29.  The ad hoc and haphazard manner in which Care One handled Dr. Holcomb's exemption application is further evident in communications from Care One representatives predating the company's initial approval of the application.  For example, in responding to Dr. Holcomb's September 3, 2021 application that same day, Care One Administrator, Ms. Leus emailed Dr. Holcomb to request documentation from her Pastor/to support [her] beliefs & the need for an accommodation."  The email began by "Per our last conversation you said you didn't have a pastor."

30.  When Dr. Holcomb replied by asking whether Ms. Leus was challenging the sincerity of her religious convictions or her right to an exemption, Ms. Leus responded "No, I was double checking if you had a pastor.  The religious exemption has been submitted to the COVID-19 task force for review.  Pls. (sic) call me if you have any questions."

12

**C.    Care One Abruptly Terminates Dr. Tzeng.**

31.    Dr. Tzeng was not even granted this gratuitous reception in response to her exemption application.  Plaintiff, Dr. Tzeng, applied for a religious exemption to mandatory vaccination on the basis of her Christian faith on September 29, 2021 after learning from Dr. Holcomb that it was the last day to apply for exemption and that Dr. Holcomb had been granted an exemption.

32.    Care One refused to even consider Dr. Tzeng's exemption application and then abruptly terminated her in retribution for her having applied for exemption and/or for having previously expressed reservations about the Covid-19 vaccine in private conversations overheard by facility representatives.  Dr. Tzeng was confronted by Care One's Chief Medical Director as well an infectious disease specialist with Care One and told to keep her opinions to herself.

33.    Prior to applying for religious exemption on September 24, 2021, Care One Marketing Director, Rikka Libatique, contacted Dr. Tzeng to request a copy of her vaccination card for the company's records.  Dr. Tzeng responded by requesting an in-person meeting the following week when she was scheduled to work.  When Dr. Tzeng reached out to Ms. Libatique for the planned face-to-face meeting on September 29, 2021, the day she applied for exemption, Ms. Libatique responded that she was out sick and unavailable.

34. The next morning of September 30, 2021, Dr. Tzeng received an email from Ms. Libatique informing her that she was terminated effective immediately and making no mention of her exemption application. The email stated further that all of Dr. Tzeng's patients were being transferred immediately to another physiatrist because COVID-19 vaccination was required at all Care One facilities. The email directed Dr. Tzeng to take steps to facilitate the transition of her patients.

35. Later on September 30, 2021, Dr. Tzeng received another email from Ms. Libatique attaching Chief Medical Director, Dr. Ahmed's aforementioned September 29, 2021 Memorandum notifying all unvaccinated Care One providers that they were banned from the company's facilities.

36. Later that day, Dr. Tzeng spoke with Care One Madison Administrator, Michael Shipley, who expressed his regrets, commenting that he was not aware Dr. Tzeng was unvaccinated and that it "was a shame" because the facility was happy with her work there.

37. When Dr. Tzeng asked Mr. Shipley why she had not been properly notified of the mandatory vaccination policy and no one had either responded to her request for exemption or discussed the request with her, Mr. Shipley replied that "it was all over the news" and that Dr. Tzeng "should have known" vaccination was required.

14

**C.   The Vaccine Mandate Enforced Against Plaintiffs Did Not Allow for Religious or Medical Exemption.**

38.   Based on Care One's actions against Plaintiffs and Chief Medical Director, Dr. Ahmed's September 29, 2021 Memorandum to the company's medical providers, Care One has adopted and enforced an absolute mandatory vaccination requirement against Plaintiffs that did not allow for religious or medical exemptions.  The Memorandum stated plainly that "[a]ll providers who interact with [Care One] residents...were required to provide a copy of their vaccination card as proof of their fully vaccinated status no later than September 30, 2021."  Asserting that ample time had been provide for everyone to get vaccinated, the Memorandum informed medical professionals "who had not provided proof of being fully vaccinated" that they were "no longer permitted entry into Care One facilities to perform patient care duties."

39.   As an absolute vaccination mandate in its application and enforcement against Plaintiffs, Care One's mandate exceeds anything required or authorized under federal law.

**E.   Care One's Mandate is More Extreme than the CMS Interim Final Rule Enjoined by Federal Courts**

40.   On November 5, 2021, the same day the OSHA promulgated its mandate, for example, the Centers for Medicare and Medicaid Services ("CMS") issued an interim final rule with respect to COVID-19 vaccination for workers in hospitals and healthcare systems that participate in Medicare and Medicaid programs.  The

15

CMS interim final rule establishes a Condition of Participation, applying to Medicare and Medicare certified facilities and encompassing most health settings, that includes most significantly a COVID-19 vaccination requirement with a deadline for compliance of January 4, 2022.

41.  Significantly, the CMS interim rule expressly requires healthcare facilities to allow for exemptions to staff with religious beliefs, observances or practices, or recognized medical conditions.  Facilities are required to establish a process for staff to request both religious and medical exemptions and ensure that requests are appropriately documented and evaluated and approved where warranted.

42.  The CMS interim rule requires facilities specifically to provide for exemptions for staff with recognized medical conditions for which vaccines are contraindicated as well as for objections grounded on religious beliefs, observances or practices established under Title VII of the Civil Rights Act of 1964.

43.  Under the CMS interim rule, where an unvaccinated staff member meets the requirements for an exemption, the facility is responsible for developing a process for implementing additional precautions to mitigate transmission and the spread of COVID-19. Such conditions currently do not include required testing for unvaccinated staff.

16

44. Care One has done nothing remotely comparable or compliant with federal law in abruptly enforcing what amounts to a blanket ban on unvaccinated providers, as enforced against Plaintiffs. It failed to develop and implement a coherent policy for considering and granting exemptions. It failed to provide those affected with clear and timely notice. It failed to develop and uniformly apply lawful criteria in considering exemption applications. It granted exemptions to a few favored providers while summarily rejecting the applications of most providers in an arbitrary and capricious manner.

**F.    Federal Courts Have Enjoined the CMS Interim Final Rule as Exceeding Federal Authority and as Arbitrary and Capricious.**

45. The vaccination mandate encompassed in the CMS interim rule was itself recently enjoined by the United States District Court for the Eastern District of Missouri in State of Missouri v. Biden, Case No. 4:21-cv-01329-MTS (Nov. 22, 2021). The Court ruled that the states challenging the CMS interim rule were likely to succeed on the merits because Congress has not granted CMS the authority to enact the mandate.

46. In rejecting the argument that Congressional authorization for the CMS mandate could be found in general grants of authority to the agency, the Court in Missouri v. Biden held that only specific grants could support the mandate, noting that Congress "must speak clearly when authorizing an agency to exercise

17

powers of "vast economic and political significance."  The Court found that given the vast political and economic significance of the vaccine mandate, only a clear authorization from Congress could empower the CMS to implement its interim rule.  The Court noted that the cost of the CMS mandate in the first year alone was approximately $1.38 billion, and that those costs do not take into account the economic significance of the mandate from the effects of facilities closing or limiting services and a significant exodus of employees that choose not to receive a vaccination.  The Court observed that "had Congress insisted to assign this question fraught with deep economic and political significance, it would have surely have done so expressly."

47.  The Court in Missouri v. Biden found further that the CMS mandate is arbitrary and capricious because the agency lacked evidence showing that vaccination status has a direct impact on spreading COVID-19 in the covered healthcare facilities.  The Court found that beyond the glaring deficiencies of evidence supporting the mandate, there was a concerning lack of data establishing the supposed link between vaccination status and the transmissibility of the virus.

48.  The Court in Missouri v. Biden cited the CMS' own acknowledgment that "the effectiveness of the vaccine[s] to prevent disease transmission by those vaccinated [is] not currently known," and that the continuing efficacy of the vaccines

18

is uncertain.  The Court noted further that "major uncertainties remain as to the future course of the pandemic, including but not limited to vaccine effectiveness in preventing 'breakthrough' disease transmission from those vaccinated, and the long-term effectiveness of vaccination.  The Court reasoned that while protecting patients and healthcare workers from contracting COVID-19 is a laudable objective, "the Court [could not] in good faith allow CMS to enact an unprecedented mandate that lacks a rational connection between the facts found and the choice made."

49.  The Court in Missouri v. Biden held further that the CMS mandate is arbitrary and capricious because the agency rejected obvious alternatives to the mandate without evidentiary justification.  The Court noted that while the CMS claimed that vaccination is a more effective infection control measure for vaccination, it cited no evidence for this conclusion.  Although the CMS rejected natural immunity from prior infection as an effective control against the spread of the virus, it cited no supporting evidence for this and went on to contradict itself by noting the reduced risk to both healthcare patients and staff from the millions of workers who have recovered from infection and thus who are no longer sources of future infections.

50.  The Court in Missouri v. Biden further held that the CMS mandate is arbitrary and capricious because it represented an abrupt change in public health policy that ignored the "reliance

19

interests of those relying on long established law with respect to vaccination." The Court noted that CMS' long-standing practice has been to encourage vaccination rather than mandate it, and could not justify the sudden change, particularly given its admission that the effectiveness of the vaccine in preventing COVID-19, reducing disease severity, and preventing disease transmission "is not currently known."

51. In its failure to consider the interests of parties relying on preexisting public health policy, the Court in Missouri v. Biden found further that the CMS did not properly weigh the benefits and risks of mandating vaccination, and in fact, ignored the latter in the push to mandate vaccination. The Court concluded that the CMS considered only evidence from interested parties in favor of the mandate, while completely ignoring evidence from interested parties in opposition. The Court concluded that evidence submitted by the Plaintiff states, healthcare providers and healthcare workers demonstrates that the mandate has been "a disaster for the healthcare industry" with possible devastating consequences to healthcare providers, staff and patients throughout the nation.

52. The CMS mandate was similarly enjoined by the United States District Court for the Western District of Louisiana in State of Louisiana v. Xavier Becerra, Case No. 3:21-cv-03970 (Nov. 30, 2021) and most recently by the United States District Court

for the Northern District of Texas in Texas v. Becerra, 2:21-cv-229-Z (December 15, 2021). Both Courts followed the Fifth Circuit's decision in BST Holdings in enjoining the CMS mandate, including on the grounds that the Plaintiff states were likely to succeed on the merits. The Courts concluded that, in implementing its mandate, the CMS appeared to have bypassed statutorily required processes for notice and comment without good cause, likely exceeded the agency's Congressionally conferred authority under the "Major Questions Doctrine," and likely violated additional provisions of the Social Security Act (42 U.S.C. 13952). The Courts further held that the CMS mandate was arbitrary and capricious, and that the CMS in issuing the mandate, likely violated other constitutional strictures, including the police power of the affected states under the Tenth Amendment, the Anti-Commandeering doctrine prohibiting Congress from issuing orders directly to the states, the Non-Delegation Doctrine precluding Congress from delegating "unfiltered power" over the American economy to an executive agency, and had likely violated the sovereignty of the States under the Spending Clause of the Constitution.

53. As of this date, all vaccine mandates implemented by the Biden Administration are or have been enjoined, including the mandate imposed on federal contractors and the one applying to employers.

21

**G.   Care One's Vaccine Mandate is Neither Medically Sound Nor Justified by Readily Available Data.**

54.   The opinion in <u>Louisiana v. Becerra</u>, cited sworn Declarations by Dr. Jay Bhattacharya, a Professor of Medicine at Stanford University and Dr. Peter McCullough, a prominent cardiologist.   Citing numerous studies tracking infection rates from literally millions of individuals, Dr. Bhattacharya has stated in public appearances as well as in sworn Declarations before federal courts, that natural immunity provides equivalent or greater protection against severe infection than immunity generated by COVID-19 vaccines.   Dr. McCullough has submitted sworn Declarations in various lawsuits stating that the COVID-19 vaccines do not prevent transmission of the disease among the vaccinated or mixed vaccinated/unvaccinated populations and that mandatory COVID-19 vaccines for hospitals do not increase safety for hospital or hospital patients.

55.   Dr. Bhattacharya has further represented in sworn Declarations that while COVID-19 vaccines provide limited protection against infection but durable protection against severe outcomes if infected, natural immunity provides durable protection against <u>both reinfection</u> and severe outcomes if infected.

56.   Dr. Bhattacharya has further stated in his sworn Declarations that vaccine side effects, while rare, do occur and can be deadly.   Such side effects include a heightened risk of

22

clotting abnormalities in young women, elevated risks of myocarditis and pericarditis, particularly in young men, and a higher risk of Guillain-Barre syndrome among others. Dr. McCullough has similarly attested to side effects adversely affecting the heart.

57. As Dr. Bhattacharya has also attested, there are multiple safe alternatives to indefinite leave or termination available to employers. Employers could adopt a robust sick policy, requiring healthcare workers who have not been vaccinated and who show symptoms consistent with COVID-19 infection to stay home from work and return only when they test negative for the virus. According to Dr. Bhattacharya, the evidence regarding transmission of COVID-19 shows that asymptomatic transmission of the disease is rare. Employers could also simply exempt from the vaccination requirement all employees who legitimately claim an exemption, such as those that have recovered from COVID infection.

58. There is a growing consensus reflected in the aforementioned federal decisions and elsewhere, that vaccination mandates are ineffective, counterproductive and have had a deleterious impact relative to the purported objectives underlying the mandates. As the Wall Street Journal reported on December 13, 2026, some of the largest hospital systems in the United States have dropped COVID-19 mandates in the wake of recent federal court decisions enjoining the Biden Administration mandates. Other

23

major corporations have followed suit.  Reportedly, as a result of the mandates, labor costs in the healthcare industry have soared and hospitals have struggled to retain nurses, technicians and even custodians.  Thousands of nurses reportedly have either left the industry or lost their jobs rather than get vaccinated.

## FIRST COUNT

### VIOLATION OF 42 U.S.C. §2000e-RELIGIOUS DISCRIMINATION IN FAILING TO ACCOMMODATE RELIGIOUS-BASED OBJECTIONS TO MANDATORY VACCINATION

59.  Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

60.  Plaintiffs' contractual and/or employment relationship with Care One falls within the protections of Title VII to the Civil Rights Act of 1964 ("Title VII").

61.  Dr. Holcomb and Dr. Tzeng hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.

62.  Plaintiffs informed Defendant Care One of those beliefs and requested a religious based exemption in accordance with Care One's announced or stated policy for mandatory vaccination.

63.  Defendant Care One refused to engage interactively with either Dr. Holcomb or Dr. Tzeng.  Their limited interaction with Dr. Holcomb was designed to deter Dr. Holcomb and others from exercising their religious beliefs or from seeking religious exemption.

24

64. Care One failed to establish a reasonable policy for review and appeal of religious exemptions to mandatory vaccination. Applications were reviewed and decisions were made on a purely ad hoc, and arbitrary and capricious basis.

65. Care One failed to apply discernable or reasonable criteria to the denial of Plaintiffs' exemption application.

66. Care One failed to articulate any grounds, much less a compelling or legally cognizable justification for denying Plaintiffs' exemption applications.

67. Care One's denial of Plaintiffs' applications for religious exemption has yielded no discernable benefits while its effects have been deleterious.

68. Care One's review and ultimate rejection of Plaintiffs' exemption applications were arbitrary and capricious.

69. Care One's treatment of Plaintiffs in connection with their exemption applications was also punitive.

70. Dr. Holcomb's religious views in support of her exemption application were treated with open hostility and her application was ultimately denied, in part, as retribution for having expressed those views.

71. The Plaintiffs' respective medical practices have been significantly harmed, if not destroyed, and they have sustained substantial financial losses. Their patients have been significantly harmed by being deprived of the Plaintiffs'

25

professional services and through the severance of their doctor-patient relationships with the Plaintiffs.

72.   Care One failed to provide Plaintiffs with "reasonable accommodation" to their religious beliefs as Plaintiffs' were permanently terminated from their positions.  Care One thereby discriminated against Plaintiffs illegally for their religious beliefs.

73.   By failing to engage in an interactive process with Plaintiffs, failing to fairly administer a reasonable and criteria-based process for considering and granting religious exemptions, Care One's discriminatory actions were intentional and/or reckless in violation of Title VII.

74.   Plaintiffs have filed charges with the Equal Employment Opportunity Commission ("EEOC") complaining of the improper and discriminatory actions set forth herein.  This Court may exercise its equity jurisdiction to grant preliminary injunctive relief to preserve the status quo pending completion of the EEOC's administrative process.

## SECOND COUNT

**VIOLATION OF TITLE VII, 2000e ET SEQ. RELIGIOUS DISCRIMINATION – RETALIATION FOR EXPRESSING RELIGIOUS-BASED OBJECTIONS TO MANDATORY VACCINATION AND FAITH-BASED DISCRIMINATION**

75.   Plaintiffs repeat the foregoing paragraphs as if fully set forth herein.

26

76.  Plaintiffs engaged in protected activity in requesting religious accommodations to Care One's vaccine mandate.

77.  Care One responded almost immediately by announcing that it effectively was terminating Plaintiffs' relationships with Care One and their access to patients residing at Care One facilities.

78.  Care One's termination of Plaintiffs was a draconian and punitive response to their request for exemption.  Care One's decision to dispense with its previously announced policy for religious exemption was intended and had the effect of forcing or coercing employees to forego their religious beliefs and receive the COVID-19 vaccine.

79.  When Care One's improper questioning of Plaintiffs' religious beliefs and other coercive measures failed to deter them from seeking exemption, Care One retaliated by terminating Plaintiffs and others similarly situated.

80.  Care One's termination of Plaintiffs' employment and relationship with Care One, and their doctor-patient relationship with Care One residents, is an adverse employment action taken in retaliation for the Plaintiffs' exercise of their religious beliefs in violation of Title VII.

81.  Care One's arbitrary, capricious and disparate treatment of the exemption request of Plaintiffs and others similarly situated, granting exemptions to a selected few for unstated reasons while responding with open hostility to requests sincerely

27

grounded in the Christian faith, constitutes faith-based discrimination.

### THIRD COUNT

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §12101

82. Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

83. Plaintiffs' contractual and/or employment relationship with Care One falls within the protection of the Americans with Disabilities Act (42 U.S.C. 12101) ("ADA").

84. Having been previously exposed to and infected with COVID-19, Plaintiffs faced enhanced risk of suffering adverse and potentially severe side effects from the COVID-19 vaccine. Plaintiffs also faced the prospect of having their natural immunities compromised by the COVID-19 vaccine.

85. Plaintiffs' prior COVID-19 infections, residual after effects and natural immune status are medical conditions that in relation to mandatory vaccination, constitute medical disabilities within the meaning of the American with Disabilities Act ("ADA"), 42 U.S.C.§12101.

86. Plaintiffs requested reasonable accommodations for these medical conditions in seeking religious exemption based in part on their natural immune status.

87. Care One violated the ADA when it refused to grant Plaintiffs' requests for exemption, and made no accommodation to the Plaintiffs' noted medical conditions.

88. Care One's failure to accommodate Plaintiffs' natural immune status and the danger of mandatory vaccination from their prior COVID-19 infection, has harmed and continues to harm Plaintiffs.

89. Plaintiffs have filed charges with the EEOC complaining of Care One's discriminatory actions. This Court may grant equity jurisdiction to grant preliminary injunctive relief to preserve the status quo pending the completion of the EEOCs administrative process.

## FOURTH COUNT

### VIOLATION OF ADA — DISABILITY DISCRIMINATION — 42 U.S.C. §121101, et seq.

90. Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

91. Plaintiffs engaged in protected activity when they requested medically based exemptions or accommodations from Care One's vaccine mandate.

92. Care One responded by taking adverse and retaliatory action against Plaintiffs when it terminated their employment and/or relationship with Care One.

29

93.  Care One's termination of Plaintiffs is an adverse and retaliatory employment action.

94.  By taking adverse and retaliatory action against Plaintiffs, Care One has violated the ADA.

95.  Plaintiffs have been substantially harmed by Care One's adverse and retaliatory actions in violation of the ADA.

96.  Plaintiffs have filed charges with the EEOC complaining of these unlawful actions.  This Court may exercise its equity jurisdiction to grant injunctive relief to preserve the status quo pending completion of the EEOC's administrative process.

## FIFTH COUNT

### VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION N.J.S.A. 10:5-12(1)

97.  Plaintiffs repeat the foregoing paragraphs as if fully set forth herein.

98.  The New Jersey Law Against Discrimination ("NJLAD") prohibits discriminatory conduct such as the above-described conduct of Care One.

99.  Plaintiffs' contractual and/or employment relationship with Care One falls within the protections of the NJLAD.

100. It is unlawful under the NJLAD for any person to discriminate in employment or to refuse to buy or sell to or from or contract with any person on the basis of religious creed or disability.

101. By virtue of its afore-described actions in rejecting Plaintiffs' exemption applications and terminating their employment and/or contract relationship, Care One has violated the NJLAD.

102. Plaintiffs have been severely harmed in their business and profession by virtue of Care One's violation of the NJLAD.

## SIXTH COUNT

### TORTIOUS INTERFERENCE WITH CONTRACT AND/OR PROSPECTIVE ECONOMIC ADVANTAGE

103. Plaintiffs restate the foregoing allegations as if fully set forth herein.

104. Care One's afore-described actions against Plaintiffs interfered with and severed Plaintiffs' doctor-patient relationships with Care One patients, to the detriment of both Plaintiffs and their patients.

105. Care One's disregard for the Plaintiffs' rights to religious and medical exemption, their retaliatory discharge and termination of Plaintiffs without warning, and their abrupt severance of the doctor-patient relationship Plaintiffs had with Care One residents constitutes the tortious interference with contract and/or the tortious interference with prospective economic advantages.

31

106. By virtue of Care One's tortious conduct, Plaintiffs have been severely harmed in their business and profession and in the professional relationship with their patients.

## SEVENTH COUNT

### BREACH OF CONTRACT

107. Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

108. Plaintiffs are contractors with a contractual relationship with Care One and corresponding contractual right to treat Care One residents.

109. Plaintiffs relied on their contractual relationship with Care One in building medical practices centered around Care One residents.

110. Plaintiffs had a contractual right and reliance-based and investment-backed expectation to continue to treat patients at Care One facilities without unreasonable interference by Care One and free of unreasonable or arbitrary and capriciously imposed conditions, such as the vaccine mandate.

111. Care One breached its contract with Plaintiffs and violated Plaintiffs' contractual rights and frustrated their reasonable, reliance-based and investment-based expectations in imposing the vaccine mandate unconditionally, and in abruptly and summarily terminating Plaintiffs based on their merely having applied for religious and medically-based exemptions.

32

112. Plaintiffs have been substantially harmed by the Defendant's breach of contract and violation of their contractual rights.

## EIGHTH COUNT

### QUASI-CONTRACT

113. Plaintiffs repeat the foregoing paragraphs as if fully set forth herein.

114. Care One's frustration of Plaintiffs' investment-based and reliance-based expectation gives rise to cause of action in Quasi-Contract and under the corollary doctrines of promissory and equitable estoppel.

## NINTH COUNT

### ACTION FOR DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. 2201

115. Plaintiffs repeat the foregoing paragraphs as if fully set forth herein.

116. Plaintiffs have the right pursuant to 28 U.S.C. 2202 to a declaratory judgment or judgments declaring Care One to have committed the various statutory violations and violations of the Plaintiffs' legal rights as alleged.

### PRAYER FOR RELIEF

By way of relief, Plaintiffs request the Court

33

1.    Declare that Care One has violated Title VII and the ADA by terminating the Plaintiffs and barring them from treating residents at Care One facilities.

2.    Declare that Care One has violated Title VI and the ADA by denying Plaintiffs' exemption applications.

3.    Declare that Care One has violated Title VI and the ADA by failing to provide reasonable accommodations to Plaintiffs' religious and medical objections to mandating vaccination.

4.    Declare that Care One has violated VII and the ADA by failing to engage Plaintiffs in an interactive process on their exemption requests, failing to consider and grant requests on a fair and rational basis and in accordance with reasonable prescribed standards and criteria.

5.    Declare that Care One has violated Title VII and the ADA by discriminating against Plaintiffs and others similarly situated in failing to provide reasonable accommodations to religious and medically based objections to mandatory vaccination, and by failing to offer and grant exemptions in a fair and non-arbitrary and capricious manner.

6.    Declare that Care One has violated Title VII and the ADA by retaliating against Plaintiffs and others similarly situated who engaged in protected activity.

34

7.  Declare that Care One has violated the New Jersey Law Against Discrimination through their various wrongful and discriminatory actions.

8.  Issue a temporary and/or permanent injunction enjoining Care One from enforcing its mandatory vaccination against Plaintiffs and other similarly situated and further enjoining Care One from denying any legitimate request for a religious or medically based exemption by Plaintiffs or other similarly situated.  The Court should enjoin such actions until Care One (a) has properly completed the interactive process for Plaintiffs and others similarly situated who request an accommodation and (b) has granted accommodations as required by law.

9.  Awarding Plaintiffs and others similarly situated, damages, including lost revenue and/or back pay, compensatory, consequential, exemplary and punitive damages and prejudgment and post-judgment interest.

10.  Reinstating Plaintiffs and others similarly situated to their prior positions with Care One.

11.  Awarding Plaintiffs reasonable attorney's fees and costs.

12.  Granting Plaintiffs such other relief as is just and equitable.

35

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issued.

Respectfully submitted,

HEROLD LAW, P.A.
Attorneys for Plaintiffs

Dated:  December 20, 2021        By:  /s/ Robert J. Donaher
                                      Robert J. Donaher, Esq.